## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ARNOLDO CARRILLO and SANTA FE
HORSE RACING BY CARILLO'S, LLC,

       Plaintiffs,

v.                                            CV 15-1111 WPL/GBW

PENN NATIONAL GAMING, INC.; CHRISTOPHER
McERLEAN; RICK BAUGH; FRED HUTTON; MY WAY
HOLDINGS, LLC, a Nevada Limited Company d/b/a
SUNLAND PARK RACETRACK and CASINO; SUNRAY
GAMING OF NEW MEXICO, LLC; RUIDOSO DOWNS
RACING, INC.; the NEW MEXICO RACING COMMISSION;
the BOARDS OF STEWARDS OF ZIA PARK, SUNLAND
PARK, SUNRAY GAMING, and RUIDOSO DOWNS; and
DAVID KEITER, ED L'ECUYER, and KENNETH HART, in
their individual capacities,

       Defendants.

## ORDER

    Arnoldo Carrillo is licensed by the New Mexico Racing Commission to train and race

horses, and did so through his company, Santa Fe Horse Racing by Carrillo's, LLC ("Plaintiffs").

Plaintiffs raced their horses at New Mexico's five licensed horse racing tracks, and were

successful doing so. They won purses totaling approximately $209,000 in 2011, $383,000 in

2012, and $100,000 in 2013, and were the American Quarter Horse Association's number six top

quarter horse owners in 2012 by races won in North America.

    Plaintiffs claim that, in 2012 and 2013, they were improperly excluded from racing at

four of New Mexico's race tracks: Zia Park, Sunland Park, SunRay Park, and Ruidoso Downs.

Plaintiffs have sued Penn National Gaming, Inc., the parent company of Zia Park, LLC, which

operates Zia Park race track, and three of their employees: Christopher McErlean, Rick Baugh,

and Fred Hutton; My Way Holdings, LLC, which operates Sunland Park race track; and Sunray Gaming of New Mexico, LLC, and Ruidoso Downs Racing, Inc., which respectively operate the SunRay Park and Ruidoso Downs race tracks (collectively "the Race Track Defendants"). Plaintiffs have also sued the New Mexico Racing Commission; the Boards of Stewards of Zia Park, Sunland Park, SunRay Park, and Ruidoso Downs (collectively "the Boards"); and David Keiter, Ed L'Ecuyer, and Kenneth Hart, members of the Boards of Stewards at Zia Park, Sunland Park, and Ruidoso Downs, in their individual capacities (collectively "the Stewards").

Plaintiffs have brought claims against the Defendants for depriving them of their liberty interest in pursuing their occupation of horse racing and violating their due process and equal protection rights. Because Plaintiffs have previously filed suit in state court for unlawful exclusion from the race tracks, all of the Defendants have filed motions to dismiss the claims made against them, raising at least one of res judicata's two barriers to repeat litigation: claim preclusion and issue preclusion. (Docs. 35, 36, 38, 39 and 40.) The Racing Commission and the Boards also claim that they are entitled to dismissal of Plaintiffs' claims because they are not "persons" for purposes of liability under 42 U.S.C. § 1983, while the Stewards assert a qualified immunity defense.

In evaluating these motions, I must accept as true all well-pled factual allegations in Plaintiffs' First Amended Complaint and must view them in the light most favorable to Plaintiffs. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014). But purely conclusory allegations are not entitled to be presumed true. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). I may take judicial notice of the pleadings in the prior state court lawsuit without converting the motions to motions for summary judgment. *Pace v. Swerdlow*, 519 F.3d 1067, 1072-73 (10th Cir. 2008). I decline Plaintiffs' request to take judicial notice of

certain documents (*i.e.*, articles in the New York Times, The Horse, and the Paulick Report) and other asserted facts because they are not appropriate for judicial notice. *See* FED. R. EVID. 201(b); *United States v. Friday*, 525 F.3d 938, 958 n.10 (10th Cir. 2008); *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1192-93 (D.N.M. 2013). When evaluating the motions to dismiss, I may not weigh potential evidence that the parties may present at trial, but focus on whether Plaintiffs' amended complaint is legally sufficient to state a claim for which relief may be granted. *Brokers' Choice*, 757 F.3d at 1135.

According to Plaintiffs, their problems began in September of 2012, when Penn National Gaming, Inc., decided to destroy Plaintiffs' racing career. Prior to this, Plaintiffs had never had any significant disciplinary action taken against them at any New Mexico race track. They had never had a horse test positive for prohibited substances in New Mexico, and had never had their racing licenses suspended or revoked. On September 9, 2012, after completing their races at Zia Park, two of Plaintiffs' horses, Sweetened Vanilla and Osceolacorona For Me, were taken back to their stables by equine ambulance or van, known in racing as being "vanned off." On September 16, 2012, representatives of Zia Park, including Rick Baugh and Fred Hutton, Zia Park's Assistant Manager and Director of Racing, met with Plaintiffs to inform them that if any more of their horses were injured or vanned off they would be excluded from participating in further races at Zia Park. Subsequently, on October 29, 2012, another of Plaintiffs' horses, De Genuine Queen, sustained a fracture to a leg during a race at Zia Park and had to be euthanized. De Genuine Queen had been inspected by a veterinarian by random lottery prior to the race and was determined to be sound. Despite this fact, shortly after the race, Zia Park management advised Plaintiffs that they could no longer race at Zia Park because of injuries to Plaintiffs' horses at the track. Zia Park requested the assistance of its Board of Stewards, David Keiter, Ed

L'Ecuyer, and Kenneth Hart, to scratch (disqualify) Plaintiffs' other horses that were scheduled to race at Zia Park.

Plaintiffs did not have an opportunity to be heard prior to their exclusion from Zia Park. Plaintiffs protested these actions, claiming that the injuries and deaths were caused by poor track conditions at Zia Park. Earlier that year, a New York Times article on horse racing reported that Zia Park had the second highest incidence of injuries and deaths per race in 2010 and the fourth highest injury and death rate in 2011, more than double the national average for both years. The Stewards at Zia Park failed to investigate Plaintiffs' exclusion from Zia Park, and in effect validated and ratified the exclusion. Plaintiffs complained about their exclusion to the New Mexico Racing Commission, but the Racing Commission likewise failed to investigate the grounds for Plaintiffs' exclusion from Zia Park.

On April 12, 2013, Plaintiffs' horse Jumpn Alegre died shortly after winning a race at Sunland Park. The New York Times article reported that the Sunland Park race track was even more dangerous than Zia Park. A necropsy of Jumpn Alegre established that it had died of pulmonary hemorrhage, and the necropsy did not disclose any prohibited drugs in Jumpn Alegre's system that might have contributed to the pulmonary hemorrhage. The next day, the Board of Stewards of Sunland Park and Rick Baugh, now the Manager at Sunland Park, without consulting Plaintiffs, decided to exclude Plaintiffs from further racing at the track because of the death of Jumpn Alegre and their record at New Mexico race tracks. The Stewards of Sunland Park and Baugh jointly informed Plaintiffs of this decision. The Board also scratched a horse owned by Plaintiffs set to run the following day.

Sunland Park management contacted the SunRay Park and Ruidoso Downs race tracks to notify them that Jumpn Alegre had died following its race. Shortly afterwards, both SunRay Park

and Ruidoso Downs excluded Plaintiffs from racing at their race tracks, again without any prior consultation with Plaintiffs, citing the death of Jumpn Alegre at Sunland Park and Plaintiffs' record at New Mexico race tracks.

The Stewards at Sunland Park, SunRay Park, and Ruidoso Downs failed to investigate Plaintiffs' exclusion from racing at these tracks. Further, the Racing Commission failed to investigate the grounds for Plaintiffs' exclusion from Sunland Park, SunRay Park, and Ruidoso Downs.

The only New Mexico track that did not exclude Plaintiffs from racing was the Downs at Albuquerque. However, racing at a single New Mexico race track could not justify the expense of maintaining a stable of race horses, and when Plaintiffs were unable to get a hearing or an investigation of their exclusion by the Stewards at the race tracks or by the Racing Commission, Plaintiffs were forced to sell their horses and give up racing.

Plaintiffs acknowledge that they have previously filed a lawsuit in state court challenging their exclusion from the race tracks. Plaintiffs filed suit in August of 2013, seeking a writ of mandamus, injunctive relief, and declaratory judgment, and also including counts for interference with contractual relations, prima facie tort, negligence, and an Inspection of Public Records claim. Plaintiffs did not make any claims for violations of their civil rights in the state court lawsuit. The state court granted summary judgment to Zia Park, LLC; My Way Holdings, LLC; SunRay Gaming of New Mexico, LLC; Ruidoso Downs Racing, Inc.; and Rick Baugh, on the ground that the race tracks had a common law right to exclude any person from their property for any lawful reason. The case is currently on appeal before the New Mexico Court of Appeals.

Cases discussing the preclusive effects of a prior lawsuit have used varying and confusing terminology, and the parties have used different terms in briefing the issues presented

in this case. Cases and commentators often refer to the preclusive effects of a prior lawsuit using the broad phrase "res judicata." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984); *Ford v. New Mexico Dep't of Pub. Safety*, 891 P.2d 546, 548 (N.M. Ct. App. 1994); 18 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4402 (2d ed. 2002). Res judicata is a judicially created doctrine designed to relieve parties of the cost of defending multiple lawsuits, conserve judicial resources, and encourage reliance on adjudication by preventing inconsistent decisions. *Park Lake Res. Ltd. Liab. Co v. U.S. Dep't of Agric.*, 378 F.3d 1132, 1135 (10th Cir. 2004); *Potter v. Pierce*, 342 P.3d 54, 57 (N.M. 2015). Properly analyzed, res judicata encompasses two distinct barriers to repeat litigation: claim preclusion and issue preclusion. Claim preclusion, a more descriptive term for what has often been called res judicata, refers to the effect of a prior judgment in foreclosing litigation of matters that have not been litigated based on a determination that those matters should have been litigated in the prior lawsuit. *Migra*, 465 U.S. at 77 n.1; *Ford*, 891 P.2d at 548; FEDERAL PRACTICE AND PROCEDURE, *supra*, at § 4402. Issue preclusion, often referred to as collateral estoppel, refers to the effect of a prior judgment in foreclosing relitigation of matters that were actually litigated and necessarily decided in the prior lawsuit. *Migra*, 465 U.S. at 77 n.1; *Ford*, 891 P.2d at 548; FEDERAL PRACTICE AND PROCEDURE, *supra*, at § 4402.

Whether Plaintiffs' complaint is barred by claim preclusion or issue preclusion is an issue of law. *BP Am. Prod. Co. v. Chesapeake Expl., LLC*, 747 F.3d 1253, 1259 (10th Cir. 2014); *Kirby v. Guardian Life Ins. Co.*, 231 P.3d 87, 105 (N.M. 2010). Under the federal full faith and credit statute, I must apply New Mexico law to determine whether claim or issue preclusion bars Plaintiffs' suit. *Strickland v. City of Albuquerque*, 130 F.3d 1408, 1411 (10th Cir. 1997); *Hubbert v. City of Moore, Okla.*, 923 F.2d 769, 772-73 (10th Cir. 1991). As the parties seeking to bar

Plaintiffs' claims, the Defendants have the burden of establishing that the elements of claim preclusion or issue preclusion have been met. *Ullrich v. Blanchard*, 171 P.3d 774, 777 (N.M. Ct. App. 2007).

The Race Track Defendants assert that Plaintiffs' complaint must be dismissed by virtue of the application of claim preclusion.[1] Both federal law and New Mexico law are consistent on the four requisite elements that govern claim preclusion. *Potter*, 342 P.3d at 57. A party asserting the defense of claim preclusion must establish that: "1) there was a final judgment in an earlier action, 2) the earlier judgment was on the merits, 3) the parties in the two suits are the same, and 4) the cause of action is the same in both suits." *Id.* Claim preclusion does not apply unless the party had a full and fair opportunity to litigate the issue in the prior proceeding. *Id.* at 59. Claim preclusion bars not only claims that were raised in the prior lawsuit, but also claims that could have been raised. *Kirby*, 231 P.3d at 105. Plaintiffs contend that the Defendants have not established the first, third and fourth elements of claim preclusion.

Plaintiffs contest, almost in passing, the first element for claim preclusion: the finality of the state court judgment. (Doc. 49 at 21-22.) They argue that the state court summary judgment is not final because it did not resolve the petition for writ of mandamus and Inspection of Public Records Act claim. Plaintiffs cite *Noland v. City of Albuquerque*, No. 1:08-cv-00056-JB-LFG, Doc. 125 (D.N.M. Jan. 26, 2011) (unpublished), for the proposition that a partial summary judgment is not given claim preclusive effect because it does not finally dispose of all issues in the case.

---

[1] While Ruidoso Downs Racing did not raise claim preclusion in its motion to dismiss, instead relying upon issue preclusion (Doc. 36), it is appropriate to consider whether claim preclusion bars Plaintiffs' claims against it because the other Race Track Defendants raised the issue and Plaintiffs had ample opportunity to argue against its imposition. *Hanig v. City of Winner, S.D.*, 527 F.3d 674, 678 (8th Cir. 2008) (citing *Arizona v. California*, 530 U.S. 392, 412 (2000); *Kirby v. OCWEN Loan Servicing, LLC*, ___ F. App'x. ___ n.2, 2016 WL 457303, at *2 (10th Cir. Feb. 5, 2016) (unpublished) (a court may sua sponte raise the defense of res judicata).

Plaintiffs' argument on this point is not worthy of the two sentences that they devote to it. *Noland* is predicated on federal, rather than state, procedural law. *Noland* begins its analysis by quoting from Federal Rule of Civil Procedure 54(b), which states that a court order that adjudicates the rights and liabilities of fewer than all of the parties "does not end the action as to any of the parties" unless the court "expressly determines that there is no just reason for delay." New Mexico takes the opposite approach to this issue. New Mexico Rule of Civil Procedure 1-054(B)(2) provides that the court may enter a judgment adjudicating all issues as to some, but fewer than all, of the parties, and that such judgment is a final judgment unless the court "expressly provides otherwise" in the judgment. New Mexico courts have long recognized that a summary judgment which adjudicates all of plaintiff's claims against a defendant is a final judgment without any requirement that the judgment state that it is final. *See Healthsource, Inc. v. X-Ray Assoc. of N.M.*, 116 P.3d 861, 866 (N.M. Ct. App. 2005); *Stotlar v. Hester*, 582 P.2d 403, 404 (N.M. Ct. App. 1978). While it is possible that the state court judgment could be reversed on appeal, it is well settled that an unreversed judgment is final between the parties as to all matters to which the judgment relates. *Brunacini v. Kavanagh*, 869 P.2d 821, 826 (N.M. Ct. App. 1993) (citing *Bank of Santa Fe v. Honey Boy Haven, Inc.*, 746 P.2d 1116, 1118 (N.M. 1987))..

Claim preclusion's third element requires a showing that there is an identity of parties or that privity exists between the parties in the first action and the parties named in the second action. *Lowell Staats Min. Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1274 (10th Cir. 1989); *Brunacini*, 869 P.2d at 825. Federal courts look to state law to define the concept of privity. *Lowell Staats*, 878 F.2d at 1274. In New Mexico, privity exists when one party is so identified in interest with another party that it represents the same right. *Brunacini*, 869 P.2d 825.

Plaintiffs assert that claim preclusion does not apply because they sued different parties in the two cases. Plaintiffs sued the following Defendants in both cases: My Way Holdings, LLC, d/b/a Sunland Park Racetrack and Casino; SunRay Gaming of New Mexico, LLC; Ruidoso Downs Racing, Inc.; Rick Baugh; the New Mexico Racing Commission; and the Boards of Stewards for Sunland Park, Zia Park, SunRay Park, and Ruidoso Downs.

Plaintiffs sued Zia Park, LLC, in the state case and have sued Penn National Gaming, Inc., in this case. However, Plaintiffs admit that Penn National Gaming, Inc. owns Zia Park, LLC, and the parent-subsidiary relationship between Penn National Gaming and Zia Park establishes privity between them for purposes of claim preclusion. *B-S Steel of Kansas, Inc. v. Texas Indus., Inc*., 327 F. Supp. 2d 1252, 1259-60 (D. Kan. 2004). Plaintiffs have sued in this case Christopher McErlean, who served as Penn National Gaming's Vice President of Racing, and Fred Hutton, who served as Zia Park's Racing Secretary and Director of Racing. Because corporations may only act through their officers, directors and agents, McErlean and Hutton are in privity with Penn National Gaming and Zia Park for claim preclusion purposes. *Lowell Staats*, 878 F.2d at 1276. Plaintiffs also sued the Stewards for the race tracks, David Keiter, Ed L'Ecuyer, and Kenneth Hart, in their individual capacities, but Plaintiffs do not seriously contend that the individual Stewards are not in privity with the Boards of Stewards sued in the initial case.

Plaintiffs' main argument against the application of claim preclusion concerns the fourth element, whether the cause of action is the same in both cases. Both the Tenth Circuit and the State of New Mexico have adopted the transactional approach to analyzing this issue. *Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1335-36 (10th Cir. 1988); *Potter*, 342 P.3d at 57. Under this approach, all issues that arise out of a "common

nucleus of operative facts" constitute a single cause of action. *Potter*, 342 P.2d at 57 (quotation omitted). Courts are to identify pragmatically the facts comprising the common nucleus, "considering (1) how they are related in time, space, or origin, (2) whether, taken together, they form a convenient trial unit, and (3) whether their treatment as a single unit conforms to the parties' expectations or business understanding or usage." *Id*. (quotation omitted).

In terms of time, space, and origin, Plaintiffs' civil rights claims in this case are premised on the same sequence of events concerning their exclusion from the race tracks in the state lawsuit. Plaintiffs argue the time-frame is different because the deprivation of their liberty interest to pursue their occupation of horse racing and due process violations are ongoing. Yet, they claimed ongoing harm in the state case because they claimed they continued to suffer irreparable harm as a result of their exclusion from the race tracks. While there would not be complete overlap of the witnesses and proof relevant to both cases, there would be substantial overlap of the witnesses and proof, which Plaintiffs grudgingly recognize. (Doc. 45 at 21.) Treating the sequence of events as a single unit would conform to the parties' expectations, because Plaintiffs admit that their civil rights claims were both well-established and well-known to them at the time of their exclusion from the race tracks.

Plaintiffs emphasize that this case involves claims for violations of their civil rights, which they did not assert in the state court case. While Plaintiffs have alleged new legal theories against Defendants, "a mere change in a legal theory does not create a new cause of action." *Apodaca v. AAA Gas Co*., 73 P.3d 215, 239 (N.M. Ct. App. 2003) (quotation omitted). "This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief." *Id*. (quotation omitted). Plaintiffs also claim that they only brought

state law causes of action in the state case because they viewed that course as the quickest and most effective way to reverse the exclusions and allow them to return to racing. (Doc. 44 at 3.) Plaintiffs are, of course, the masters of their litigation strategy, and may pursue litigation as they choose, "subject only to the sanction that a second action may not pick up matters omitted from the first." FEDERAL PRACTICE AND PROCEDURE, *supra*, at § 4407.

The fact that Plaintiffs' civil rights claims are based on federal rather than state law does not affect the application of claim preclusion. *Strickland*, 130 F.3d at 1412. Further, the state court would have had subject matter jurisdiction over the civil rights claims. *Id*.

Plaintiffs assert that claim preclusion should not apply because the issue of whether the race track exclusions may constitute state action was not resolved in the first case. This argument reflects a misunderstanding or confusion concerning the elements of claim and issue preclusion. To establish issue preclusion, a party must prove that the issue in the second case is identical to the issue in the first case, and that it was actually litigated and necessarily decided. *Ullrich*, 171 P.3d at 778. In contrast, "[c]laim preclusion does not depend upon whether the claims arising out of the same transaction were actually asserted in the original action, as long as they could have been asserted." *Ford*, 891 P.2d at 555. To the extent that a second case advances any part of the same claim involved in the first case, claim preclusion bars it. *Id*. Plaintiffs were aware of the existence of the civil rights claims during the state court case, and were obligated to bring all related claims together under the common law rules that prohibit the splitting of claims. *Apodaca*, 73 P.3d at 241.

Plaintiffs admit that they could have brought their civil rights claims in the state court case (Doc. 46 at 5 n.9), but contend that combining these claims with their state law claims would have made the case unwieldy and would defeat judicial economy. To the extent that is

true, the state court judge could have bifurcated the case. *Valdez v. Walck*, 2014 WL 1314871, at *3 (N.M. Ct. App. Feb. 27, 2014) (unpublished) (noting that the trial court has discretion to bifurcate claims). Under modern forms of procedure, parties may present all material relevant to a claim without being confined to a particular theory or form of relief. *Strickland*, 130 F.3d at 1412. Once Plaintiffs chose to seek judicial relief in state court, the interests of the Defendants and of society in bringing litigation to a close weighed heavily in favor of requiring Plaintiffs to assert all available claims relating to their exclusion in a single action. *Id.* at 1413. Plaintiffs have failed to demonstrate a "clear and convincing need of an extraordinary and compelling reason to overcome policies favoring preclusion of a second action." *Apodaca*, 73 P.3d at 241. Because the Race Track Defendants have established all elements of their defense of claim preclusion, Plaintiffs' claims against the Race Track Defendants must be dismissed.[2]

The Racing Commission, the Boards and the Stewards contend that they are entitled to dismissal by virtue of issue preclusion. The doctrine of issue preclusion fosters judicial economy by preventing the relitigation of "ultimate facts or issues actually and necessarily decided in a prior suit." *Shovelin v. Central N.M. Elec. Co-op.*, 850 P.2d 996, 1000 (N.M. Ct. App. 1993) (quotation omitted). Issue preclusion requires proof of four elements: 1) the party against whom issue preclusion is asserted must have been a party or in privity with a party to the prior action; 2) the subject matter of the two cases is different; 3) the ultimate fact or issue was actually litigated in the prior action; and 4) the issue was necessarily determined in the prior litigation. *Ullrich*, 171 P.3d at 778; *DeLisle v. Avallone*, 874 P.2d 1266, 1269 (N.M. Ct. App. 1994). Issue preclusion does not apply when the ultimate issue in the second case was not litigated or decided

---

[2] Given this ruling, I need not address the other issues raised by the Race Track Defendants in their motions to dismiss.

in the first case, *Ullrich*, 171 P.3d at 778, or when it is unclear whether the issue was actually decided, *City of Sunland Park v. Macias*, 75 P.3d 816, 821 (N.M. Ct. App. 2003).

If the moving party establishes a prima facie case of issue preclusion, then the burden shifts to the opposing party to show that he or she was not afforded a full and fair opportunity to litigate the issue in the prior litigation. *DeLisle*, 874 P.2d at 1270. Whether to apply issue preclusion is within the trial court's discretion, which should determine whether application of the doctrine would be fundamentally unfair and would not further the aim of the doctrine. *Id.*; *Shovelin*, 850 P.2d at 1002.

Plaintiffs assert that the actions taken by the Stewards had such a close connection to the actions of the Race Track Defendants to render Plaintiffs' exclusions from the race tracks state action. The Racing Commission, the Boards, and the Stewards assert that this issue was both actually litigated and necessarily decided against Plaintiffs in the state case.

A review of the state court record disproves Defendants' assertions. The state court judgment determined that the Race Track Defendants properly exercised their "common law right to exclude any person for any lawful reason" from their property, and does not address the issue of state action. (Doc. 35-2 at 2.) Defendants argue that the state action issue was implicitly decided in the state case, yet it is hard to see how since Defendants did not raise this issue in the motions filed in state court. (Docs. 38-1 and 40-1.) In My Way Holdings' and Rick Baugh's motion for summary judgment, they framed the issue as whether Sunland Park had a lawful right to deny Plaintiffs entry to the race track. (Doc. 38-1 at 2.) In support of their motion, they argued that Sunland Park had a common law right to exclude any person from its race track for any reason, that New Mexico had affirmed this common law right to exclude by both statute and

regulation, and that Sunland Park lawfully excluded Plaintiffs from the race track for safety reasons. (*Id*. at 2-10.)

Similarly, Zia Park's and Baugh's motion for summary judgment asserts that the "undisputed facts show Defendants lawfully exercised their right of exclusion as private property owners." (Doc. 40-1 at 11.) And the Memorandum they filed in support of their motion tracks the same arguments made by My Way Holdings and Baugh: that Zia Park had a common law right to exclude any person from the race track for a lawful reason, that New Mexico had affirmed the common law right of exclusion, and that Zia Park properly excluded Plaintiffs for a lawful reason. (Doc. 40-1 at 3-8.) Notably absent from these motions is any discussion of state action.

My Way Holdings and Baugh did briefly address the issue of state action in the Reply Brief they filed in state court. (Doc. 38-3 at 9-11.) This came too late, however, because the New Mexico rules, consistent with the federal rules, require every motion to "state with particularity the grounds" and relief sought. N.M. R. CIV. P. 1-007.1(A); FED. R. CIV. P. 7(b)(1)(B-C). "[R]eply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *Pac. Gas & Elec. Co. v. United States*, 69 Fed. Cl. 784, 817 (2006) (quotation omitted). The general rule in the Tenth Circuit "is that a party waives issues and arguments raised for the first time in a reply brief." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 767-68 n.7 (10th Cir. 2009). New Mexico courts apply the same rule. *Mitchell-Carr v. McLendon*, 980 P.2d 65, 73 (N.M. 1999); *see also Greentree Solid Waste Auth. v. Cnty. of Lincoln*, 365 P.3d 509, 514 (N.M. Ct. App. 2015) ("Ordinarily, we will not consider an argument raised for the first time in a reply brief unless it is directed to new arguments or authorities presented in the answer brief.") Even if this

rule did not apply, raising the issue of state action in a reply brief would deprive Plaintiffs of a full and fair opportunity to address the issue. The motion to dismiss on issue preclusion grounds must be denied because the Racing Commission, Boards and Stewards have failed to establish that the elements of issue preclusion have been met, and because Plaintiffs did not have a full and fair opportunity to address the issue of state action in state court.

The Racing Commission and the Boards assert that they should be dismissed because they are not "persons" for purposes of liability under 42 U.S.C. § 1983. A cause of action under section 1983 "requires a plaintiff to show both the existence of a federally-protected right and the deprivation of that right by a person acting under color of state law." *Wittner v. Banner Health*, 720 F.3d 770, 773 (10th Cir. 2013). The Supreme Court has held that a State, a governmental entity that is considered an "arm of the State," and officials acting in their official capacity are not "persons" within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).

Plaintiffs admit that the Racing Commission and the Boards are not "persons" under § 1983. They contend, however, that they are able to state a claim against the Racing Commission and the Boards for prospective relief. The Supreme Court has recognized an exception to the personhood requirement for actions that seek prospective relief to prevent a continuing violation of federal law by state officials. *Verizon Md., Inc. v Pub. Svc. Comm'n of Md.*, 535 U.S. 635, 645-47 (2002); *Will*, 491 U.S. at 71 n.10. The Racing Commission and Boards implicitly recognize this exception in their Reply Brief and request that any monetary damage claims against them be dismissed. Accordingly, I will dismiss Plaintiffs' claims for retroactive money damages against the Racing Commission and the Boards. To the extent that

Plaintiffs seek prospective relief such as declaratory or injunctive relief, those claims are not precluded by § 1983's definition of "person" and are not subject to dismissal.

Finally, the Stewards claim they are entitled to dismissal based on qualified immunity. Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Ashcroft*, 556 U.S. at 672 (quotation omitted). In resolving this issue, I must consider whether the facts that Plaintiffs allege make out a violation of a constitutional right, and whether that right was clearly established at the time of the Stewards' alleged misconduct. *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

A constitutional right is clearly established if its contours are clear enough that a reasonable official would understand that what he or she was doing violated it. *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015). Ordinarily, for a constitutional right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (quotation omitted). Courts should not define clearly established law at a high level of generality but instead on the basis of the specific context of the case. *Quinn*, 780 F.3d at 1005. General statements of law are insufficient to satisfy the "clearly established" prong of the qualified immunity test. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Instead, the unlawfulness of the official action must be apparent in light of the pre-existing law. *Id*. In determining whether a right is clearly established, "it is crucial to look at precedent applying the relevant legal rule in similar factual circumstances. Such cases give government officials the best indication of what conduct is unlawful in a given situation." *Id*. at 753 (Thomas, J., dissenting).

For Plaintiffs to state a claim for relief under § 1983, they must establish not only a deprivation of a constitutional right, but also that the deprivation was committed under color of state law. *Brokers' Choice*, 757 F.3d at 1143. If Plaintiffs' exclusions from the race tracks may be attributable to the state, Plaintiffs have a liberty interest in pursuing their profession of horse racing and are entitled to due process of law if they are to be lawfully denied an opportunity to do so. *Barry v. Barchi*, 443 U.S. 52, 64 (1979); *State Racing Comm'n v. McManus*, 476 P.2d 767, 771 (N.M. 1970). In *Barry* and *McManus*, state racing stewards suspended a horse trainer and a jockey from racing for violating state rules or regulations that governed racing. *Barry*, 443 U.S. at 59; *McManus*, 476 P.2d at 768. These cases recognize that, while a trainer or jockey is not entitled to a hearing before the state suspends his license, due process requires that the state provide a prompt post-suspension hearing. *Barry*, 443 U.S. at 64; *McManus*, 476 P.2d at 771. Further, the Equal Protection Clause prohibits state entities from treating similarly situated persons differently. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 949 (10th Cir. 2003).

On the other hand, a race track owner's common law right to exclude a person from its grounds has been recognized for many years. "The core image of property rights, in the minds of most people, is that the owner has a right to exclude others [from his property] and owes no further obligation to them." Gregory S. Alexander, *The Social-Obligation Norm in American Property Law*, 94 Cornell L. Rev. 745, 747 (2009); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); *Santa Fe Cnty. Bd. of Cnty. Comm'rs v. Town of Edgewood*, 97 P.3d 633, 636 (N.M. Ct. App. 2004). A property owner's common law right of exclusion developed to recognize that proprietors of businesses open to the

public also had a broad right to exclude members of the public from their businesses. Gregory S. Alexander, *The Complex Core of Property*, 94 CORNELL L. REV. 1063, 1065-66 n.18 (2009).

The Supreme Court recognized a race track owner's common law right to exclude patrons from its property over 100 years ago in *Marrone v. Washington Jockey Club of D.C.*, 227 U.S. 633 (1913). Since *Marrone*, numerous courts have affirmed the actions of race tracks under the common law in excluding not only patrons, but also owners, trainers and jockeys from their property. *See Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231 (3d Cir. 2002); *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079 (2d Cir. 1990); *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 238-43 (Iowa 2006); *Bresnik v. Beulah Park Ltd. P'ship*, 617 N.E.2d 1096, 1097-98 (Ohio 1993); *Marzocca v. Ferone*, 461 A.2d 1133, 1136-38 (N.J. 1983); *Arone v. Sullivan Cnty. Harness Racing Ass'n*, 457 N.Y.S.2d 958 (N.Y. App. Div. 1982).

Several states have enacted statutes that modify or eliminate a race track's common law right to exclude in order to provide expanded protections for racing licensees. *See PNGI Charles Town Gaming, LLC v. Reynolds*, 727 S.E.2d 799, 806-08 (W. Va. 2011) (recognizing that the West Virginia Code eliminated a race track's unrestricted common law right to exclude licensees, but not its right to exclude patrons); *Sims v. Jefferson Downs Racing Ass'n*, 778 F.2d 1068, 1075 (5th Cir. 1985) (recognizing that 1982 amendments to the Louisiana statutes modified a race track's common law right to exclude licensees from the track). New Mexico has not followed the lead of these states. Instead, in 2001, New Mexico confirmed a race track's common law right of exclusion by regulation in the New Mexico Horse Racing Act, N.M. CODE R. § 15.2.2.8(V), and in 2014 confirmed it by statute, N.M. STAT. ANN. § 60-1A-28.1.

Whether the exclusion of Plaintiffs from the race tracks can be fairly attributed to the state is not a simple inquiry. The Supreme Court has established a number of approaches to the

question of fair attribution. In *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S.

288 (2001), the Court stated:

> Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State of its agents." We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," when it has been delegated a public function by the State, when it is "entwined with governmental policies," or when government is "entwined in [its] management or control."

*Id.* at 296 (citations omitted) (alteration in original).The Tenth Circuit has referred recently to

these as the "nexus test," the "public function test," the "joint action test," and the "symbiotic

relationship test." *Wittner*, 720 F.3d at 775. However the factors or tests are described,

determining whether state action is present is a "necessarily fact-bound inquiry," and "no one

fact can function as a necessary condition across the board for finding state action; nor is any set

of circumstances absolutely sufficient, for there may be some countervailing reason against

attributing activity to the government." *Brentwood Acad.*, 531 U.S. at 295-96, 298.

Plaintiffs rely primarily upon an unpublished district court case from Pennsylvania and a

Third Circuit case to argue that the Stewards' participation in Plaintiffs' exclusions from the race

tracks renders the exclusions state action under the nexus test. (Doc. 44 at 13 – 16, citing *Moreno*

*v. Penn Nat'l Gaming Inc.*, 2012 WL 3637316 (M.D. Pa. Aug. 22. 2012) (unpublished)[3], and

*Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589 (3d Cir. 1979)). Both cases present

significantly different facts. In *Moreno*, a horse trainer was suspended by the race track after he

was found in possession of syringes and needles at the race barn, in violation of Pennsylvania

racing regulations. 2012 WL 3637316, at *1. The court found there was sufficient state

---

[3] Plaintiffs fail to disclose that this decision was later vacated by the court upon stipulation of the parties. *Moreno v. Penn Nat'l Gaming Ass'n*, 2013 WL 1719177 (M.D. Pa. Jan. 16, 2013) (unpublished).

involvement in the race track's decision to suspend the trainer from racing because there was "State involvement at every stage" of the proceeding. *Id*. at \*5. As support for its conclusion, the court stated that the alleged violations of Pennsylvania Racing Commission rules were discovered by state inspectors; the evidence was confiscated by state officials; the investigation into the allegations was conducted by state officials at a state laboratory; race track management met with state officials and relied upon information it received from them when it suspended the trainer for violating state Racing Commission rules and regulations; and management contacted the stewards to scratch plaintiff's horses from racing. *Id*.

In *Fitzgerald*, Mount Laurel Racing suspected that Fitzgerald, a harness race driver, was engaging in inconsistent driving at the track. *Fitzgerald*, 607 F.2d at 593. Mount Laurel met with Pennsylvania racing officials before suspending Fitzgerald for violating state racing commission rules. *Id*. The court noted that Fitzgerald's appeal would require it "to plunge once again into the murky waters of the state action doctrine" underlying a § 1983 action. *Id*. at 591. The Third Circuit found that Mount Laurel's action in excluding Fitzgerald constituted state action for two reasons. First, although Mount Laurel had a common law right to exclude Fitzgerald, Mount Laurel did not rely on its common law right to exclude but instead suspended him for violating rules established by the Pennsylvania Racing Commission. *Id*. at 597-98. Second, Pennsylvania racing state officials met with Mount Laurel to analyze Fitzgerald's conduct and participated in Mount Laurel's decision to suspend him for violating state rules. *Id*. at 598-99. The court held that "it is only when the state officials with delegated authority to enforce state laws or regulations *participate* with management in the decisional process to expel for a violation of a State Commission Rule is the requisite nexus" for state action established. *Id*. at 600 (emphasis in original).

Other cases make clear the fact-intensive nature of this inquiry. In *Bier v. Fleming*, the general manager of Painesville Raceway decided to exclude Bier, a trainer and harness horse race driver, from racing at the track. 717 F.2d 308, 310 (6th Cir. 1983). Bier did not dispute that the general manager made a private decision to exclude him from the track. *Id*. at 311. The general manager instructed security personnel not to admit Bier to the track, and instructed state racing officials to remove Bier's name from the racing program. *Id*. The district court concluded that the state became involved in the race track's private action when it removed Bier's name from the racing program. *Id*. at 309. The Sixth Circuit, applying the nexus test to determine this issue, reversed. It first determined that the state's extensive regulation of the horse racing industry and receipt of revenue from the track did not transform otherwise private actions into state action. *Id*. at 311. The court next found that the action of state officials in removing Bier's name from the racing program "was not a sufficient exercise of coercive power or significant encouragement on part of the State to find state action in an otherwise private decision." *Id*. Merely approving or acquiescing in the actions of the race track to exclude Bier was not sufficient to justify holding the state responsible for the exclusion. *Id*.

The fact-bound nature of the state action inquiry is well-illustrated in *Sims* v. *Jefferson Downs Racing Ass'n*. Sims, a horse trainer, was excluded from the Jefferson Downs Race Track after complaining about conditions at the track. 778 F.2d at 1071. The general manager of the track wrote a letter to Sims informing him that he had been barred from the track. *Id*. One of the racing stewards summoned Sims to the stewards' office, and there was conflicting testimony concerning whether the steward delivered the letter to Sims or was simply present when the letter was delivered to him. *Id*. at 1076-77. Later, the chair of the Racing Commission met with the parties and negotiated a "gentlemen's agreement" under which Sims would relinquish his license

through November 8, 1975. *Id*. at 1072. After the agreement ended, Sims returned to the track, and on March 22, 1976, he was arrested by the police on the general manager's allegation that Sims was in violation of the exclusion letter. *Id*. The general manager also requested that the stewards take action against Sims for violating the exclusion letter, and in response, the stewards issued two rulings denying Sims access to the track. *Id*. at 1072-73.

The Fifth Circuit recognized that Louisiana had statutorily eliminated a race track's common law right to exclude a licensee, and held that a race track that wanted to exclude a licensee could do so only through the stewards or in accordance with an order of the Racing Commission. *Id*. at 1075-76. The court closely examined the facts to affirm in part and reverse in part the district court's finding of state action. The court first found that the steward's limited participation in delivery of the exclusion letter to Sims did not constitute state action, distinguishing *Fitzgerald* because of the greater involvement of state officials in that case. *Id*. at 1076-77. Because one of the members of the Racing Commission negotiated the gentlemen's agreement, the court found that any actions taken by the race track under that agreement constituted state action. *Id*. at 1077. On the other hand, because neither the Racing Commission nor the stewards participated in Sims' arrest, the arrest could not be fairly attributed to the state. *Id*. at 1078. Finally, because a race track in Louisiana no longer has a common law right to exclude, when Jefferson Downs solicited the use of the stewards to enforce the exclusion letter and the stewards issued two rulings excluding Sims from the track, Jefferson Downs was a willful participant in joint action with the state. *Id*. at 1079.

The Tenth Circuit has characterized the application of the state action doctrine as "one of the more slippery and troublesome areas of civil rights litigation," a "paragon of unclarity," and a question that "frequently admits of no easy answer." *Gallagher v. Neil Young Freedom Concert*,

49 F.3d 1442, 1447 (10th Cir. 1995) (quotations omitted). Whenever a fact-intensive balancing test is involved to determine an issue, the facts of the existing case law must closely correspond to the contested facts to defeat qualified immunity. *Columbian Fin. Corp. v. Stork*, 811 F.3d 390, 402 (10th Cir. 2016).

Plaintiffs claim that the Stewards of Zia Park, SunRay Park, and Ruidoso Downs participated in the exclusions of Plaintiffs from the race tracks because they scratched Plaintiffs' horses after management informed them of the exclusions, and they failed to investigate the reasons for the exclusions. The starting point in analyzing this claim is to recognize that New Mexico has not modified or eliminated a race track's common law right of exclusion. Management at the race tracks retained the right to exclude Plaintiffs for any lawful reason. There are no Supreme Court or Tenth Circuit cases that construe facts similar to the actions taken by the Stewards, and there is no clearly established weight of authority from other courts finding the law to be as Plaintiffs' claim. The Stewards' actions seem most analogous to *Bier*, where racing stewards removed Bier's name from the racing program, or to *Sims*, where a steward participated in delivery of the exclusion letter, after the race tracks invoked their common law right of exclusion. Neither action was sufficient to make the exclusion attributable to the state. *Sims*, 778 F.2d at 1076-77; *Bier*, 717 F.2d at 311. Further, mere approval of or acquiescence by the Stewards of the exclusions does not constitute state action. *Gallaghe*r, 49 F.3d at 1450. Given the uncertainty in how the Tenth Circuit or the Supreme Court would apply the state action test to these facts, the Stewards of Zia Park, SunRay Park, and Ruidoso Downs could not reasonably be expected to know that their actions would violate the law. Thus, Plaintiffs have failed to establish that the Stewards of Zia Park, SunRay Park, and Ruidoso Downs violated a clearly

established constitutional right, and the Stewards at these tracks are entitled to dismissal of Plaintiffs' claims based on qualified immunity.

Plaintiffs' claim concerning the actions of the Stewards of Sunland Park is more complicated. According to Plaintiffs, the Stewards of Sunland Park not only scratched their horses and failed to investigate the reasons for their exclusion, but they also participated with management in the decision to exclude Plaintiffs from Sunland Park, and jointly communicated that decision to Plaintiffs. In *Fitzgerald*, the Third Circuit held that "it is only when the state officials with delegated authority to enforce state laws or regulations *participate* with management in the decisional process to expel for a violation of a State Commission Rule is the requisite nexus" for state action established. 607 F.2d at 600 (emphasis in original). Plaintiffs do not contend that they were excluded from Sunland Park for violating a Racing Commission rule or regulation. However, Plaintiffs allege far more than mere acquiescence by the Stewards to the decision by Sunland Park. The Stewards' participation in the decision to exclude Plaintiffs may constitute state action under the close nexus or joint action tests. *Wittner*, 720 F.3d at 775-76, 777. Accordingly, the Stewards of Sunland Park are not entitled to dismissal of Plaintiffs' claims based on qualified immunity.

Therefore, the Race Track Defendants' motions to dismiss on claim preclusion grounds are granted; the motion to dismiss filed by the Racing Commission, the Boards, and the Stewards on issue preclusion grounds is denied; because the Racing Commission and the Boards are not "persons" for purposes of liability under § 1983, the motion to dismiss filed by the Racing Commission and Boards is granted as to claims for retroactive monetary damages against them, but denied as to Plaintiffs' claims for prospective relief; and the motion to dismiss on qualified immunity grounds filed by the Stewards of Zia Park, SunRay Park, and Ruidoso Downs is

24

granted, while the motion to dismiss on qualified immunity grounds filed by the Stewards of

Sunland Park is denied.

IT IS SO ORDERED.

_William P. Lynch_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.